May it please the Court, I am Bill Stark for the Plaintiff, Jeremy Cameron. I haven't prepared any profound statements for the Court. I think that the briefing is very thorough. We did update the Court with recent legislation from the Oregon State Legislature which addressed family leave which, according to the legislation, has a retroactive effect. And we've asked the Court to take that under consideration. Essentially what this case is about, the center of this case is a point system that T-Mobile had. Obviously when I first got the case, it was seen as a point system case, a simple matter of looking at their point system and looking at the reasons for why they terminated Mr. Cameron and to see if any of those points were given to him for any illegal improper reason. As the Court has before it, it has a number of facts that showed that they did take into consideration that he was absent to care for his sick children. And under Oregon State law, that is allowed, but they held that against him. He had a zillion points anyway, right? He had plenty of points. If we exclude all the children, all the ones he told them were for sick children, plus the ones that he now says really were for sick children, he still had lots of points, right? Including some where he just plain lied to the employer about taking them, correct? No. There's no evidence of that, Your Honor. The points that the points that the points that the defendant's own employer or employee identified for the cause of his termination, the points that they identified in his termination papers did not add up to over the limit unless they included one or two days that he was absent to care for his sick children. That's supported by a doctor's note, and that's supported by Mr. Cameron's testimony. As to those absences, did he testify that he had told the employer contemporaneously about the reason for the absence? Right. The Mr. Cameron, the problem with the reasons, and I've detailed that. That was a yes or no question. Is there evidence in the record that, including his own statements, that he told the employer contemporaneously about having to care for sick children with respect to some of the absences during the final six months? Yes, there is, from his own testimony and then from some of their own records. See, their records are very conflicting. When we asked for records even before the lawsuit and after the lawsuit in response to request for termination, we got some records from the company. And some of those records indicated he called in, but there wasn't any reason noted. And other records that they produced then or a week before summary judgment, the last round of summary judgment, they indicate that when he called in, they did mark that he was absent to take care of his sick child. In other words, there's conflicting evidence in the record, in their own records, the defendant's own records, about having noted that he called in for a sick child. So their own conflicting records, records from one department saying he called in, no reason given, the same day, the same location, Salem Call Center, and that person noted that he called in for a sick child. So what you have is a lot of conflicting records from the company itself showing that he did call in and identify a reason, and then other people didn't put down the reason. So when you look at the law that applies to a company of that size with that number of employees, they were required to keep those records. They were required to keep people informed of what their rights were under the law, and the record is just full of information that they did not do that. Mr. Cameron's own supervisors testified they didn't know about family leave law. They didn't know about sick child leave. And to narrow that, they didn't know about sick child leave under Oregon law. May I follow up on Judge Fernandez's question? How many points do you need to be fired? Let's see. Boy, I've seen so much action. It's four within six months, isn't it? The last policy, I think it was put together in January of that year, was four in a six-month period. That was a guideline, right? It was not automatic. They did not have to terminate you at four. They could wait until eight or nine or ten, right? Well, their policy was that they could do that or you would be eligible for termination if you hit those points. That was what their policy was. They had, if I remember correctly, they had at least three policies of one kind regarding absenteeism when Mr. Cameron was there and he wasn't there that long a period of time. How many points did they say he had? I can't recall their calculations. The district court said that in 2002 alone, he called in sick or left early 20 times in 2002 alone. So the district court, how the district court read the record, is that incorrect? I think that's a distraction, Your Honor. And I think it may be a distraction, but is the district court accurate or inaccurate? I don't know what a distraction means. Maybe I'm distracting you. A distraction means that, as the record shows, this company has tremendous amount of data about each and everything that's done, each and everything that employees do. In terms of absenteeism, I don't, I would not, given the facts that you have before you, I would not tell you that their record of anything of that nature is accurate because they, you saw, you see in the record that a week before the final summary judgment, they came up with additional records which tried to support their summary judgment motion but actually could be viewed as supportive of the plaintiff. Tell me about February 6th and 7th, speaking of distractions. If I understand, their distracting records for that period indicates that he asked for vacation days on those two days and they said, no, we can't do that. And then he called in sick for those two days. Is that true or is that just distracting? I believe he addresses that in his affidavit. And I don't remember the details of what he addressed, but he had a perfectly normal explanation for that. I'm sure he had a normal explanation. I'm just asking, are those facts accurate? He asked for those two days to be off for vacation and they said, no, we can't afford to have you off those days. And then, which is a surprising thing to happen, he calls in, surprisingly, on those two days. He happens to be out sick on those two days. He's sick. Is that accurate or not? That's all I'm asking. I believe he did call in, but there's nothing in the record that indicates that the defendants felt that he had called in, had lied when he called in. I believe I included testimony from his supervisors that stated that he didn't lie about anything. So that, on the record, is something that occurred. It wasn't a lie. It wasn't made up. He didn't go on vacation or anything of that nature. There's nothing in the record of that nature. And the most important thing is- Let me make sure I understand your answer to Judge Fernandez's original question. If you exclude all of the protected leave, did they or didn't they have the right or have cause to still fire him for his other absences? No. The way I calculated it, they would not have had enough absences to fire him. How many were missing? One or- They gave him four or four and a half points and they included his sick child leave in one of those cases, which would have put him below the four. And there's another date in there that's controversial where he may have been absent for a sick child as well. So that would still put him below the four in the six months. So you mentioned like 22 or something at an earlier period of time. That's not material to their decision to fire him. They fired him for his absences in that six-month period. And it didn't add up to over four unless you included his sick child leave. And you have a doctor's note for the, I think, November 8th and 9th, I believe it is, that shows that his son, in fact, had to go for medical treatment. So that was the focus of the case in the beginning was those simple points. And it's gotten more complex since. If I could give us the start. May it please the Court, Todd Hanchett on behalf of T-Mobile. Counsel, I have a few questions for you that I'd like to walk you through some things. It appears to me that the employer has discretion whether to terminate someone or not following a fourth unplanned absence. Do you agree with that, that that's a guideline and not a requirement? I do agree with you, Your Honor, that that is a guideline. And the other thing that seems to be a given is that the manager, in fact, in her deposition testimony agreed that she had taken into account in her thinking the absences that included absences for taking care of a sick child. She did indicate in her deposition testimony when she learned that there was at least information that he may have reported that to T-Mobile, that she did take those into account. And let me be clear, on a historical basis, she did not have, she testified that she had no specific recollection of any conversation with him about absence for a sick child. Right. She had no recollection, but his affidavit or testimony, I can't remember right now, which said that he did tell the employer whether she remembered it or not, whether they wrote it down or not, his testimony, whether it's believed or not is another question, but that he did tell the employer contemporaneously on, I think, three occasions during that six-month period. And I guess my question for you is the following. In view of the fact that we have to take the facts in the light most favorable to the plaintiff in this procedural posture of the case, and the manager concedes that absences were taken into account that might have been related to this, why isn't that a factual question for the jury? Well, that's the reason that we argued in our brief that taking his account of those facts as true, that even excluding those, that February 6th and February 7th absence would have resulted in his termination in any case. There were a sufficient number of absences, and this goes back to your original question. Because let's say I counted differently than plaintiff's counsel. I counted that there were eight minus three, so that with the child care ones there were eight, without them there would be five. But since it's an exercise of discretion, how do we know without a fact finder looking at it that the employer's decision would have been the same with five they obviously didn't do it at number four. So how do we know without a fact finder where is the tipping point? Well, I don't think, Your Honor, that that creates a factual issue that a trier of fact must determine. There's nothing to indicate that she took those into account. She said she did. At ER 89, she said she took into account the absences, including the ones where she was aware or would have been aware that there was a sick child involved. Right. But let's be clear about the way she testified about that. She was, in her deposition, was referring to what was placed in front of her was the written warning, or the request for termination, I should say. And it recounted previous documentation, none of which indicated that he called in sick for a sick child. And T-Mobile's records, and I understand that. T-Mobile's records are confusing, because if you look at the sequence starting at SER 126 and the sequence starting at SER 167, which report to be the same time frame, they don't match. For example, at SER 168, there's a July 2002 date that shows that he called in due to a sick child. That does not appear in the other printout. The same is true for a March 20th date. In one case, it says, child is sick. And in the other, it says, he called in sick. So, you know, I guess I just don't understand why there aren't issues of fact as to what the employer knew and what it took into account. Well, let me speak to those two specific portions of the record. Just for background, the section beginning at 168, that's the portion that is completed by the Workforce Management or Resource Planning Department. And T-Mobile policy required that the employee call in when they were going to be absent, call into Resource Planning or Workforce Management, the name has changed, and their supervisor. And the records you're looking at at 168 are the product of Workforce Management's conversations with the employee. The records beginning at 126 are those that are entered by supervisors. But doesn't that support the plaintiff's assertion, if he told the central group, I don't have the names of these right, but if he told the central group, my kid is sick and it's reflected in the company's own records, and on the same date it doesn't say that with the supervisor, but his testimony is, I also told the supervisor, why doesn't the material in your own records support an inference that it's the mistake of the supervisor and not the plaintiff? Well, it's actually consistent with some of his testimony where he was unclear about who he exactly called. Sometimes he was sure that he called Workforce Management, but he wasn't certain that he called his supervisor. So there's the opportunity for those to conflict, and that information that goes to Workforce Management, I understand this is one company and you would hope that everything gets back around, but sometimes it doesn't in an organization of this size. And there's nothing in the record to suggest that his supervisor believed or understood that either of those, any of those absences, those three that we're talking about, were for a sick child. And therefore, there's no reason to, there's no basis on which a trier of fact could find that she considered those, she considered the dates, yes, and she testified to that. She did not consider them as sick child absences. He says that he did tell the supervisor that he reported accurately that it was for a sick child. I don't know whether a jury would believe that, but he said so. Well, and that's why I was pointing back to the fact that he wasn't entirely clear what he reported to whom. Sometimes he only called into Workforce Management and didn't call his supervisor. And that gets us to the difference that at least potentially led to the supervisor relying on some of those dates, that she had no idea why they were in the system. But when she looked at this, the E-folder, SCR 126 going forward, that's the information that was available to her. Does that matter? Pardon? Does that matter? Does what matter? I'm sorry. Well, she did, let's say a jury, she did in fact look at dates where he was out because of a sick child. Now, she didn't know that she was doing that, but she did in fact. So the question really is, the company knows. Company is company. You know, this big thing and it's got all its pieces and the company knows. Okay? And she in fact did look at those. Now, it may indeed be that she would have fired him anyway, especially after this fun and games in February. But that's not entirely the question before us, is it? The question is whether he was somehow retaliated against. I'm setting aside the interference argument because I don't know what interference means in Oregon law. I hardly know what it means in federal law. But anyway, I'll set that aside. Couldn't that be taken as retaliatory? They fired him, she fired him, perhaps in part because of the fact that he was out with a sick child. Not because in her head, but because in the memory and in the mind of the company, because. But retaliation requires that connection. And if she had no bad motive or did not have those in her mind at the time she made the decision, she did not have the motive. Even though we can talk in terms of the company as a whole, the large corporation knew, the key question on a retaliation claim will be, did she know when she made that decision? And there's nothing in the record to suggest that she did. Let me change gears for a second. This was a diversity case, and the federal court was obligated to apply state law, right? Correct. And the district judge specifically declined to follow an Oregon Court of Appeals decision and instead followed, took a contrary view of the law. What do we do about that? Shouldn't we reverse that and tell the district judge to go back and reconsider the case in light of Oregon law? Well, the district judge, since that time, the district itself has considered the question. What do you mean has considered the question? I'm sorry? I don't understand what you mean. Considered the, I think we're talking about Yeager. Yes. In the Court of Appeals decision. Yeager's never been applied in this case, has he? Well, the district court, no, it preceded Yeager, so it has not been applied specifically to this case. So why should we say go back and now apply the proper law to this case? Well, because the analysis that the district judge applied here followed the analysis of Judge Hubel, who after the decision in Yeager took supplemental briefing in that case. And still declined to follow Yeager. I'm sorry? And didn't he still decline to follow Yeager? Yes, he did. How can that possibly be correct? Well, his analysis actually explains the reasons why. But even if a state court of appeals is wrong in some metaphysical sense, a federal court, just like a trial court in the state, has to follow what the appellate court says, doesn't it? Well, no. As the district court pointed out, they're not bound by any intermediate decisions. They're bound by a decision of the Supreme Court. That's half true, right? That's about 50 percent true. I think it's an accurate statement because it's then qualified by, they have to find some reason why they think the Supreme Court would decide it differently. I'm sorry, not. That's 50 percent true. Yes, and that's the second point. It's not that they have to find a reason. They have to decide that the Supreme Court, if it got it, would make a different decision from the court of appeal, correct? They have to find that the Supreme Court would not decide it the same way. And they have to be right, right? You would hope that they were. Well, they have to be right. When you get up here, you have to convince us they were correct. Not that they kept, not that the district court kept following other district judges, but that all those folks were correct, right? Yes, and in fact, I believe that the district court was correct in their finding. If we disagree with you, is there any reason we shouldn't reverse the case? If we say the district court should have followed Oregon law instead of rejecting Oregon law, is there any reason we shouldn't reverse the case and tell the district judge to reconsider? I know I believe, Your Honor, that would be correct as to that particular claim, yes. Mr. Fernandez or Judge Gravel? Thank you, Mr. Hanschen. Thank you. Mr. Stark, you exceeded your time. We'll give you 30 seconds, if you'll keep it to 30 seconds. Unless the Court has any further questions. Well, there is. I have no further. Fair enough. Thank you, gentlemen. The case, as just argued, is submitted.
judges: Fernandez, Silverman, Graber